1  Richard W. Osman, State Bar No. 167993
2  Sheila D. Crawford, State Bar No. 278292
   Corey C. Wilson, State Bar No. 332800
3  BERTRAND, FOX, ELLIOT, OSMAN & WENZEL
   2749 Hyde Street
4  San Francisco, California 94109
   Telephone: (415) 353-0999
5  Facsimile:  (415) 353-0990
   Email:     rosman@bfesf.com
6              scrawford@bfesf.com
               cwilson@bfesf.com
7

8  Attorneys for Defendants
   CITY OF VALLEJO, COLIN EATON and
9  JORDON PATZER

10

11                          UNITED STATES DISTRICT COURT

12                          EASTERN DISTRICT OF CALIFORNIA

13  DEYANA JENKINS, an individual,              Case No. 2:19−cv−01896−TLN−SCR

14          Plaintiff,                          **DECLARATION OF COREY C. WLSON IN**
                                                **SUPPORT OF DEFENDANTS CITY OF**
15  v.                                          **VALLEJO, COLIN EATON, AND JORDON**
                                                **PATZER'S OPPOSITION TO PLAINTIFF'S**
16  CITY OF VALLEJO, a municipal corporation;   **MOTION TO EXTEND DEPOSITION LIMITS**
    ANDREW BIDOU, in his individual capacity    **SET FORTH IN F.R.C.P. 30(a)(2)(A)**
17  as Chief of Police; COLIN EATON, in his
    individual capacity as Police Officer for the  Date:   July 31, 2025
18  CITY OF VALLEJO; JORDON PATZER, in       Time:  10:00 a.m.
    his individual capacity as Police Officer for the  Place:  Courtroom 27, 8th Floor
19  CITY OF VALLEJO and DOES 1-50,                    501 I Street
    inclusive,                                        Sacramento, California 95814
20

21          Defendants.
22
                                                **Hon. Sean C. Riordan**
23

24

25

26

27

28

1

WILSON DECLARATION IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXTEND
DEPOSITION LIMITS SET FORTH IN F.R.C.P. 30(a)(2)(A)
*Jenkins, v. City of Vallejo, et al.* U.S.D.C. Eastern District of California Case No.: 2:19-cv-01896-TLN-SCR

I, Corey C. Wilson, declare as follows:

1.    I am an attorney at law duly licensed to practice law before the courts in the State of California, and I am an associate with the law firm of Bertrand, Fox, Elliot, Osman & Wenzel, attorneys of record for defendants CITY OF VALLEJO (the "CITY"), COLIN EATON and JORDON PATZER in the above-captioned matter.    As such, I have personal knowledge of the facts and circumstances surrounding this matter and could, if called, competently testify thereto.

2.    A true and correct copy of excerpts from Plaintiff DEYANNA JENKINS' deposition transcript is attached as **Exhibit A**.

3.    Plaintiff's counsel first asserted to our office that Plaintiff's *Monell* claim included a component for racism or racial profiling in Spring 2025.    On May 22, 2025, my office sent Plaintiff's counsel a correspondence disputing that assertion.    A true and correct copy of that correspondence is attached as **Exhibit B**.

4.    To date, Plaintiff has taken the depositions of Defendants JORDON PATZER and COLIN EATON, the CITY'S Rule 30 designee ("Person Most Knowledgeable" or "PMK") regarding certain police practices, CITY employees Steve Darden and Stephanie Sifuentes, and former CITY employees/contractors Ron Tabron, John Whitney, and Andrew Bidou.

5.    Plaintiff's PMK deposition notice sought testimony regarding six categories related to police practices.    The designated witness testified regarding all six categories.

6.    I personally defended the deposition of Lt. Steve Darden.    Plaintiff's counsel devoted a substantial amount of time at that deposition to discussing her own personal interactions with Lt. Darden on Facebook.    I have reviewed the transcript from that deposition, and the portion related to her personal interactions with Lt. Darden spans more than 20 pages.

7.    I personally defended the deposition of Stephanie Sifuentes and attended the deposition of Ron Tabron.    The majority of both depositions focused on the CITY'S police hiring practices after the subject incident.

8.    A true and correct copy of excerpts from Ron Tabron's deposition transcript is attached as **Exhibit C**.

//

1

1       9.     A true and correct copy of excerpts from John Whitney's deposition transcript is attached

2 as **Exhibit D**.

3       10.    A true and correct copy of excerpts from Chief Andrew Bidou's deposition transcript is

4 attached as **Exhibit E**.

5       11.    A true and correct copy of excerpts from Lt. Steve Darden's deposition transcript is

6 attached as **Exhibit F**.

7

8       I declare under penalty of perjury under the laws of the State of California that the foregoing is

9 true and correct, and that this declaration was executed on the 25th day of June 2025, at San Rafael,

10 California.

11                     By:        */s/ Corey C. Wilson*

12                                 Corey C. Wilson

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WILSON DECLARATION IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXTEND
DEPOSITION LIMITS SET FORTH IN F.R.C.P. 30(a)(2)(A)
*Jenkins, v. City of Vallejo, et al.* U.S.D.C. Eastern District of California Case No.: 2:19-cv-01896-TLN-SCR

EXHIBIT A

EXHIBIT A

```
                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA




        DEYANA JENKINS, an     Case No. 2:19-CV-01896-TLN-SCR
        individual,

                    Plaintiffs,

              vs

        CITY OF VALLEJO,
        a municipal corporation;
        ANDREW BIDOU, in his
        individual, capacity as
        CHIEF OF POLICE, COLIN EATON;
        in his individual capacity as
        POLICE OFFICER for the CITY OF
        VALLEJO; JORDON PATZER, in his
        individual capacity as POLICE
        OFFICER for the CITY OF VALLEJO
        and DOES 1-50, inclusive,

                    Defendants.
                                       )




                Zoom Videotaped Deposition of

                       DEYANA JENKINS

                      May 14, 2025




           NOTICING ATTORNEY:  COREY WILSON



        REPORTED BY:  ADRIENNE MEDA, CSR NO. 6609
```

*Deyana Jenkins v. City of Vallejo*

```
          1    you're related to Willie McCoy?

          2          A.  Correct.

          3          Q.  What do you identify as your race?

          4          A.  African-American.

01:35     5          Q.  Do you have any reason to believe the

          6    officers pulled you over because you're

          7    African-American?

          8          A.  No.

          9          Q.  All right.  I meant to ask this when we

01:35    10    were talking about the other people in the car.  But

         11    I'd like to go through each of those people and talk

         12    to you about how you know them, how long you've known

         13    them.

         14               So let's start with Bri.  How long have

01:35    15    you known her?  Or -- yeah, let's -- how long have

         16    you known her?

         17          A.  At the time?

         18          Q.  That was where my pause was.  I wasn't

         19    sure if I wanted to ask at the time or now.  Let's do

01:35    20    at the time.

         21               At the time of the incident, how long had

         22    you known Bri?

         23          A.  A year.

         24          Q.  How did you meet her?

01:36    25          A.  Through a former friend.
```

*Deyana Jenkins v. City of Vallejo*

```
 1   UNITED STATES DISTRICT COURT

 2   EASTERN DISTRICT OF CALIFORNIA

 3

 4
                I, ADRIENNE MEDA, duly authorized to
 5   administer oaths pursuant to Section 2093(b) of the
     California Code of Civil Procedure, do hereby certify
 6   that:
                        DEYANA JENKINS
 7
     the witness in the foregoing deposition was duly
 8   remotely sworn by me to testify to the truth in the
     within entitled cause; that said deposition was taken
 9   at the time and place as set forth; that the
     testimony of said witness was reported by me, a
10   Certified Shorthand Reporter and a disinterested
     person, and was thereafter transcribed by computer
11   under my direction into booklet form; that the
     witness was given an opportunity to read and correct
12   said deposition and to subscribe to the same.

13              I further certify that I am not of
     counsel or attorney for either or any of the parties
14   in the foregoing deposition and caption named, nor in
     any way interested in the outcome of the cause named
15   in said caption.

16              Executed June 3, 2025, at San Rafael,
     California.
17

18

19

20

21                  Adrienne Meda

22                  Adrienne Meda, CSR No. 6609

23

24

25
```

EXHIBIT B

EXHIBIT B



Sheila D. Crawford
scrawford@bfesj.com
(415) 353-0999 x110

Bertrand, Fox, Elliot, Osman + Wenzel

May 22, 2025

VIA EMAIL

Melissa Nold
NOLD LAW
521 Georgia Street,
Vallejo, California 94590

      Re:    *Jenkins v. City of Vallejo*
             U.S.D.C. Eastern District of California
             Case No. 2:19−cv−01896−TLN−SCR

Melissa,

        We write to address your recent assertions regarding the scope of Plaintiff's *Monell* claim in this case and several of the additional deposition you have requested, which would exceed the allowable number of depositions under the federal rules.

<u>*Monell* Claims</u>

        You asserted in a recent correspondence that Plaintiff's *Monell* claim is not limited to excessive force, and that you are entitled to discovery regarding whether the City is "still engaging in and hiding racism or unlawful misconduct of any kind, and any actions wherein the City sought to hide, or failed to investigate misconduct or racism of any kind". The *Monell* claim alleged in the Complaint and which survived the Motion to Dismiss is not nearly so broad.

        The First Amended Complaint alleges that the City has a "culture, policy or practice of promoting, tolerating and/or ratifying with deliberate indifference, the use of excessive force and the fabrication of official reports to cover up the Defendants' and DOES 1-25's inclusive, misconduct". (FAC at 7:4-6.) It alleges that the City "exhibits a pattern and practice of using excessive force and misconduct against citizens" and that it had a culture of "deliberate indifference towards protecting citizen's rights". (FAC at 7:21-22; 8:1-2.) It included allegations of 19 different incidents of alleged excessive force to support the custom, policy, and practice claims. (FAC at ¶28.) While there are some conclusory allegations of racial profiling elsewhere in the FAC, they are entirely absent from the *Monell* claim section. The *Monell* section alleges the City was on notice of "repeated acts of unconstitutional excessive force", had training defects "including but not limited to unlawfully using excessive force to make detentions and/or arrests", and that these deficiencies "resulted in the deprivation of Plaintiff's constitutional rights including, but not limited to the right to be free from excessive force by Officers". (FAC at 18:10-12; 19:1-9.) In short, there is nothing in the FAC which would have placed the City on notice that Plaintiff was attempting to assert a *Monell* claim based on any misconduct other than excessive force.

        The arguments made during the Motion to Dismiss regarding the *Monell* claim further support this interpretation of the FAC. In your Opposition, you cited as support for Plaintiff's *Monell* claim allegations that the City's "long documented history, pattern and practice of ignoring, encouraging and promoting excessive force violations and cultures in the department is

BFEOW
Bertrand, Fox, Elliot, Osman + Wenzel

well known" and that the City's "steadfast denial and/or refusal to properly train, supervise, and/or discipline its Officers for using excessive force demonstrates the existence of an entrenched culture, policy or practice of promoting, tolerating and/or ratifying with deliberate indifference the use of excessive force and the fabrication of official reports to cover up the Defendant Officer' misconduct". (Opposition to Motion to Dismiss at 5:3-5; 5:13-16.) You further argued that Chief Bidou ratified the "custom, culture and practice of using excessive force" (Opp. at 10:7-11), and that the 20 prior incidents of "police misconduct" alleged in the FAC, 19 of which dealt with excessive force, supported Plaintiff's allegations of a custom, pattern, and/or practice. (Opp. at 11:19-25.) The only time the Opposition referred to the claims of racial profiling was to argue that they supported Plaintiff's state law claims for negligence and violation of the Bane Act claim.

The Court's order denying the Motion to Dismiss the *Monell* claim noted that the Opposition argued Plaintiff had adequately pled a *Monell* claim because "she alleges past incidents of excessive force that establish a pattern of misconduct and ratification". (Order on Motion to Dismiss 4:2-5.) It further noted that the allegations "about prior incidents of excessive force" could support a *Monell* claim. (Order at 4:15-17.) The Court then analyzed the similarity of the force used in the alleged prior incidents with the force used in this case, *without any mention whatsoever of racism or misconduct other than excessive force* and concluded the *Monell* claim was sufficient to survive the Motion to Dismiss. (Order at 5:22-6:2.)

Plaintiff has not alleged a *Monell* claim for racism, racially profiling, or general "misconduct" beyond excessive force. The Court's order makes clear that the *Monell* claim which was allowed to proceed is solely related to excessive force. You are entitled to discovery regarding the incident and which would be related to your *Monell* claims for excessive force. You are not entitled to continue to conduct this fishing expedition into every allegation of racism at any time in the department. We have permitted you a wide degree of latitude in questioning during the depositions to date, because the witnesses have had at least some arguable connection to this incident or to Plaintiff's *Monell* claim for excessive force, even if your questioning regularly vastly exceeded that scope. This was particularly notable during the depositions of Ron Tabron and Steve Darden. Moreover, your client testified at her deposition **that she had no basis for believing that she was pulled over because of her race.** Even if you had properly asserted a *Monell* claim for racial profiling or racial harassment, there is no basis for further pattern and practice discovery on this issue when race was not a factor in the underlying alleged constitutional violation.

It should also be noted that your office has taken the following depositions:

1. Jordon Patzer (3/14/25)
2. Ron Tabron (3/17/25)
3. Colin Eaton (4/25/25)
4. Steve Darden (4/28/25)
5. Jeremy Huff as PMK (5/8/25)
6. Stephanie Sifuentes (5/12/25)
7. John Whitney (5/13/25)

Melissa Nold
May 22, 2025
Page 3

BFEOW
Bertrand, Fox, Elliot, Osman + Wenzel

In addition, the following depositions are scheduled or in the process of being scheduled:

8. Andrew Bidou (5/23/25)
9. Shawny Williams (6/9/25)

You have indicated you would like to depose another PMK, Deputy Chief Bobby Knight, former Deputy Chief Joseph Gomez, and Lt. Robinson. We will not agree to allow you to exceed the ten deposition limit set forth in Federal Rule of Civil Procedure 30. If you wish to take more than ten depositions you will need to seek a court order, which we intend to oppose.

Very truly yours,

BERTRAND, FOX, ELLIOT, OSMAN & WENZEL

By: _____
Sheila D. Crawford

SDC/cw

CC: Adante Pointer
    Patrick Buelna
    Ty Clarke

EXHIBIT C

# EXHIBIT C

1                  UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF CALIFORNIA

3

4

  DEYANA JENKINS,                    )
5                                    )
              Plaintiff,             )
6                                    )
      vs.                            ) CASE NO.:
7                                    ) 2:19-cv-01896-
  CITY OF VALLEJO, et al.,           ) TLN-DB
8                                    )
              Defendants.            )
9  _____ )

10

11

12

13

14

15

16            DEPOSITION VIA ZOOM OF RON TABRON

17                     GILROY, CALIFORNIA

18           MONDAY, MARCH 17, 2025, 10:05 A.M.

19

20

21

22  Stenographically Reported by:

23  Carina Valles, CLR
    CSR No. 12605

24

25  Job No. 316455

                                                               1

1    this case?

2         A.   No.  No.

3         Q.   So the incident we're talking about is

4    April 2019.

5              That was before you were hired with Vallejo;

6    right?

7         A.   That's correct, yes.

8         Q.   Do you know anything about the City's policies

9    or procedures that were in place in April of 2019 before

10   you started?

11        A.   No.  Regarding, like, use of force or pursuit

12   or --

13        Q.   Generally, yeah.

14        A.   Yeah, no, I really don't know of any -- any of

15   their policies because each department is different and

16   I know they're very similar in standard operating

17   because of the lawsuits and state laws and stuff like

18   that, but -- but, yes, I'm not -- firsthand knowledge,

19   no, I do not.

20        Q.   Do you have any understanding about the City --

21   or the department's culture in April 2019?

22        A.    If I'm familiar with things that I heard about

23   Vallejo prior to me being hired about the culture, I had

24   heard that -- that it was a tough city.  Yeah, I mean, I

25   knew it was like a military city at some point and the

                                                         157

1   STATE OF CALIFORNIA  ) ss.

2

3        I, CARINA VALLES, CLR, CSR No. 12605, do hereby

4   declare:

5

6        That, prior to being examined, the witness named

7   in the foregoing deposition was by me duly sworn;

8

9        That said deposition was taken down by me in

10  shorthand at the time and place therein named and

11  thereafter transcribed under my direction;

12

13       I further declare that I have no interest in the

14  event of the action.

15

16       I declare under penalty of perjury under the laws

17  of the State of California, that the foregoing is true

18  and correct.

19

20       WITNESS my hand this 11th day of April, 2025.

21

22

23  _____
    CARINA VALLES, CLR, CSR No. 12605

24

25

                                                        208

EXHIBIT D

EXHIBIT D

1                    UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF CALIFORNIA

3

4    DEYANA JENKINS, AN INDIVIDUAL,      )
                                         )
5                  PLAINTIFF,            )
                                         )
6         VS.                            ) CASE NO. 2:19-CV-01896
                                         )              TLN-DB
7    CITY OF VALLEJO, A MUNICIPAL        )
     CORPORATION; ANDREW BIDOU, IN HIS   )
8    INDIVIDUAL CAPACITY AS CHIEF OF     )
     POLICE; COLIN EATON, IN HIS         )
9    INDIVIDUAL CAPACITY AS POLICE       )
     OFFICER FOR THE CITY OF VALLEJO;    )
10   JORDON PATZER, IN HIS INDIVIDUAL    )
     CAPACITY AS POLICE OFFICER FOR THE  )
11   CITY OF VALLEJO AND DOES 1-50,      )
     INCLUSIVE,                          )
12                                       )
                   DEFENDANTS.           )
13   _____)

14

15

16             REMOTE DEPOSITION OF JOHN WHITNEY

17             TUESDAY, MAY 13, 2025, 10:04 A.M.

18

19

20

21

22   STENOGRAPHICALLY REPORTED BY:

23   LAURY WASOFF, CSR NO. 10995

24   JOB NO.:      318815

25

                                                              1

 1          Q.    At the time somebody leaked a video of the

 2     incident with Mr. Robles and leaked it to the media and

 3     that came out in the media unbeknownst to the department

 4     without any notice.  Is that how you remember that

 5     happening?

 6          A.    Yes.

 7          Q.    And so then there were media people kind of

 8     crawling around, asking questions, because it was, as I

 9     recall, pretty concerning for the community because this

10     was a guy who was a crime victim who seemed like he had

11     been a victim of excessive force, and people wanted to

12     know what happened and what was being done about it.  Is

13     that fair to say?

14          A.    Yes.

15          Q.    And it's my understanding that Lee Horton and

16     others told the media on the record -- there's videos

17     and transcripts of this -- that they were doing an

18     internal affairs investigation into that incident with

19     Darden, that they were doing interviews and they were

20     taking it very seriously.  Is it your understanding that

21     they actually didn't take it seriously, that they

22     laughed about that incident and they never IA'd it?  Do

23     you have any knowledge of that?

24          MS. CRAWFORD:  Objection.  Calls for speculation.

25     Assumes facts not in evidence.  Vague.

                                                              51

1    THE WITNESS:  It's a two-part answer.  As far as the

2    investigation, I was told that the investigation that

3    was conducted wasn't into Sergeant Darden.  Or he was

4    Officer Darden at the time.  It was into discovering who

5    released the video to the media.

6         And the second part of your question of people

7    laughing at briefing, yes, that occurred at the time.

8    The video was played in briefing and people laughed

9    about it.

10   Q    BY MS. NOLD:  My understanding, despite telling

11   the public that the department took it seriously, the

12   department didn't take it seriously at all.  Right?

13   MS. CRAWFORD:  Objection.  Vague.  Calls for

14   speculation.

15   THE WITNESS:  I don't believe they did.  The

16   investigation wasn't into the actual act.  It was into

17   trying to determine who leaked it.

18   Q    BY MS. NOLD:  They were more concerned about

19   the whistleblower than Steve Darden taking a guy, leg

20   sweeping him, pushing him backwards onto his head on the

21   ground and kneeled on his chest.  That wasn't the

22   concern.  They were looking to figure out who had leaked

23   or whistle blew that action to the media?

24   MS. CRAWFORD:  Same objections.

25   THE WITNESS:  That was my understanding after

                                                      52

1    Patzer.

2         Q.   Was there a Jason Patzer that worked there that

3    you recall?

4         A.   I heard that name.  I don't believe he's a

5    police officer.  I believe there's maybe a firefighter

6    by that name.  I don't know if they're all related,

7    though.  There is a Patzer family from Vallejo.  So I

8    don't know.  I know there's a lot of different members,

9    though.

10        Q.   So Jeremy was the former officer who is

11   Jordon's dad, and that would be on his legacy badge,

12   would be Jeremy's number in small?

13        A.   Yes.

14        Q.   That person doesn't have to be deceased.

15   Correct?

16        A.   No, not at all.

17        Q.   Do you remember a time when Chief Bidou was

18   trying to get Kelly Trujillo to come in and sit for the

19   critical incident reviews and attempt to make them

20   attorney-client privileged as opposed to publicly

21   releasable public documents?

22        MS. CRAWFORD:  Objection.  Calls for speculation.

23   Vague.

24        THE WITNESS:  No.  That was an actual technique that

25   was used to involve Mrs. Trujillo in everything.  Not

                                                              89

1    just those meetings but emails and text group messages.

2    And if you removed her for any reason, he would make

3    sure he added her back in.  I tested it a couple times

4    by removing her and seeing what would happen, and he

5    would put her right back into the messages.  I believe

6    it was right around 2018, 2019 that that practice

7    started.

8        Q    BY MS. NOLD:  An incident review is something

9    that once it's completed, it's publicly releasable.

10   Right?

11       A.   I'm not aware of the PRA laws.  I believe so,

12   but I don't know.

13       Q.   I don't expect you to be an expert in things

14   you don't do or didn't do.  And obviously the law may be

15   different now than it was at the time when you were

16   looking at it.  But it wasn't just your understanding.

17   They actually engaged in the practice of trying to

18   involve the city attorney's office, specifically

19   Ms. Trujillo, who is now sitting on the bench in Solano

20   County, to use her presence to try to make things

21   attorney-client privileged that would not have been

22   otherwise?

23       MS. CRAWFORD:  Objection.  Calls for speculation.

24       THE WITNESS:  No.  It was specifically talked about

25   that we needed to leave her in everything so everything

90

1    was attorney-client privileged and could never be

2    publicly released.

3        Q    BY MS. NOLD:  And she was on the emails and in

4    the meetings, so she was compliant to the extent that

5    she was there, she was attempting to make those

6    privileged.  Right, to your understanding?

7        MS. CRAWFORD:  Calls for speculation.

8        THE WITNESS:  I don't know what her thought process

9    was.  But all I know is we were told to make sure that

10   any emails or texts that we sent to each other, that she

11   was either in the email group or she was in the text

12   group.  We always had to make sure to add her.

13       Q    BY MS. NOLD:  And did Ms. Trujillo or anyone

14   else from that office ever direct you to destroy

15   evidence or conceal records in evidence?

16       MS. CRAWFORD:  I'll object to the extent there is

17   any communication with Ms. Trujillo and she was the

18   assistant city attorney, so it would be privileged.

19       Q    BY MS. NOLD:  I'm asking for things that

20   wouldn't be privileged which are things that would be

21   criminal in nature.  Asking you to do something that you

22   knew or you believed you weren't supposed to do.  That

23   would be something like hiding evidence, concealing

24   something.  So not anything where you were having a

25   privileged conversation.  But if you were discussing

91

1    something like concealing records, that is ongoing and

2    that would not be subject to attorney-client privilege.

3    So anything like that that wouldn't be subject based on

4    you knowing it was wrong or illegal at the time or

5    believing it might be wrong or illegal at the time.

6         A.   Not that I can think of as I sit here today.

7         Q.   You mentioned earlier when you talked about

8    legacy badges, Herman Robinson.  Is he still working for

9    the police department?

10        A.   Yes, he is.  He is still a lieutenant with the

11   police department.

12        Q.   He's been there what?  48, 40-something, high

13   40s, almost 50 years?

14        A.   I believe he was sworn in in the neighborhood

15   of 52, 53 years in his career between the city of

16   Vallejo and Berkeley Police Department.

17        Q.   That's where he started?

18        A.   Yes.  In fact, he started at Vallejo PD in

19   September of 1973.  So 52 years he's been with -- he's

20   coming up on 52 years.  So it's 51 right now with the

21   police department.

22        Q.   Are you guys friends?

23        A.   Yes, we are.

24        Q.   That seemed so specific to know when he was

25   there.

1    speculation.  Not proportional.

2         THE WITNESS:  That is correct.

3         Q    BY MS. NOLD:  And as a result of the

4    information that they provided, which included the name

5    of the woman that Mr. Darden was allegedly involved

6    with, alleged that at times when he was supposed to be

7    working, that he would come to Vallejo and park his car

8    and then go spend time with this woman while out on sick

9    leave.  Is that your understanding of what they

10   disclosed?

11        A.    They didn't disclose exactly that.  It's just

12   they had disclosed that he was having an affair with

13   their mother.  The other side of it was discovered later

14   through informal investigation.

15        Q.    Okay.  They provided the information that he

16   was at the house.  Right?  And then through some manner

17   of investigation, it was determined that he was using

18   sick leave during the times that the brothers had said

19   he was at their house.  Is that correct?

20        A.    That's correct.

21        Q.    And then at the time when that information came

22   into the interview, that Jason Potts or somebody else in

23   the interview ceased the interview and stopped it.  Is

24   that accurate?

25        A.    It was not Jason Potts who stopped the

                                                    142

1    interview.

2       Q.   Charles Bartlett?

3       A.   His name was Kevin Bartlett.  He was our

4    sergeant at the time.

5       Q.   Kevin Bartlett.  Okay.  Thank you.  Was there

6    also a Charles Bartlett, Officer Charles Bartlett that

7    you recall?

8       A.   If there was, he was there for a brief minute.

9    We hired some officers that only lasted maybe a month

10   and didn't like the agency and went back to their former

11   agencies.  I don't know if that was one of those

12   officers.  But I never worked with a Charles Bartlett

13   that I know of.

14      Q.   But you identified the person in that interview

15   with those suspects was an Officer Kevin Bartlett,

16   Detective Kevin Bartlett?

17      A.   Yeah.  He was the detective sergeant.  Myself

18   and Detective Postolaki, Ted Postolaki were conducting

19   the interview, and we were stopped by Detective Sergeant

20   Kevin Bartlett.

21      Q.   Stopped the interview and let the suspects go.

22   Right?

23      A.   Yes.  And then our DVD at the interview was

24   seized by Detective Bartlett.

25      Q.   Seized and destroyed, to your understanding?

143

1          MS. CRAWFORD:  Calls for speculation.

2          THE WITNESS:  I don't know what happened to it.  We

3     never got it back.

4          Q    BY MS. NOLD:  To my understanding, it sounds

5     like somebody tried to get an IA or get -- you know,

6     reported it, trying to get somebody to look into what

7     happened, but Lee Horton put Darden out on a 12-week

8     FMLA and said it would violate his HIPAA rights to do an

9     IA.  Does that sound right?

10         MS. CRAWFORD: Calls for speculation.  Vague.  Not

11    proportional.

12         THE WITNESS:  By the time everything had come out, I

13    was back to being a patrol sergeant because we had come

14    out of bankruptcy.  So I was repromoted to sergeant.

15    And I inquired about it because Officer Darden again

16    worked for me.  And I was told that he was being placed

17    on this 12-week FMLA leave and that no IA was to take

18    place; that it was being handled by Horton himself who

19    was the lieutenant of professional standards at the

20    time.  So that was my last involvement in it.

21         Q    BY MS. NOLD:  Did you ever consider reporting

22    that to anybody?

23         A.   I was a sergeant at the time, and the

24    environment at Vallejo, if I had reported that, I would

25    have been looking for a new job in 2011, 2012, not in

                                                        144

```
 1  │  STATE OF CALIFORNIA     )
    │                          )
 2  │  COUNTY OF LOS ANGELES  )

 3  │      I, Laury Wasoff, Certified Shorthand Reporter

 4  │  No. 10995, Do Hereby Certify:

 5  │      That prior to being examined, the witness named in the

 6  │  foregoing deposition was by me duly sworn to testify to

 7  │  the truth, the whole truth, and nothing but the truth;

 8  │      That said deposition was taken down by me in shorthand

 9  │  at the time and place therein named and thereafter

10  │  transcribed under my direction, and the same is a true,

11  │  correct, and complete transcript of my shorthand notes so

12  │  taken.

13  │      That if the foregoing pertains to the original

14  │  transcript of a deposition in a federal case, before

15  │  completion of the proceedings, review of the transcript

16  │  {x} was { } was not requested.

17  │      I further certify that I am not in any way interested

18  │  in the outcome of this action.

19  │      In witness whereof, I have hereunto subscribed my name

20  │  this 23rd day of May, 2025.

21  │

22  │

23  │                        _____

24  │                        LAURY WASOFF, CSR NO. 10995

25  │
```

229

EXHIBIT E

EXHIBIT E

```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF CALIFORNIA

 3

 4     DEYANA JENKINS, an individual,

 5                                          )
            Plaintiff,                      ) Case No.
 6                                          ) 2:19-cv-01896-TLN-DB
                 vs.                        )
 7                                          ) Pages 1-146
       CITY OF VALLEJO, a municipal         )
 8     corporation; ANDREW BIDOU,           )
       in his individual capacity as        )
 9     Chief of Police; COLIN EATON,        )
       in his individual capacity as        )
10     Police Officer for the              )
       CITY OF VALLEJO; JORDON PATZER,      )
11     in his individual capacity as        )
       Police Officer for the              )
12     CITY OF VALLEJO and DOES 1-50,       )
       inclusive.                           )
13                                          )
            Defendants.                      )
14                                          )
       --------------------------------)

15

16                - NON-CONFIDENTIAL PORTIONS -

17

18                  DEPOSITION OF ANDREW BIDOU

19                    Zoom Videoconferencing

20                    Friday, May 23, 2025

21

22

23     Reported by  N. Antoinette Cèrge
                     CSR No. 7294
24     Job No.:      318396

25
```

                                                                    1

1        Q    Ms. Trujillo was also put on all of the

2    emails coming in and out of the Department, right?

3        A    I wouldn't know.  I don't think so.

4        Q    You don't recall a conversation that you had

5    with Mr. Whitney where he had removed her from some of

6    the emails and you said to make sure to put her back on

7    them because that's how they were gonna keep everything

8    confidential?

9        A    That never happened.

10       Q    Okay.  So there weren't multiple people

11   present when that conversation happened because you

12   never had that conversation, right?

13       A    Well, that's not what I wanted, so I'm sure that

14   conversation didn't happen.

15            I'm the one that wanted the City Attorney on

16   the Board.  If you ask me, I can tell you why.

17       Q    No, I'm not asking that.

18       A    It has nothing to do with --

19       Q    Yeah, I'm not asking that.

20       A    -- the public records.

21       Q    Okay.  I understand.

22            In time, it was 2019 when the public record

23   laws were changing and Ms. Trujillo suddenly started

24   sitting in the critical incident reviews.  Do you

25   acknowledge that?

                                                            82

CERTIFICATE OF REPORTER

STATE OF CALIFORNIA        )
                          ) SS:
COUNTY OF LOS ANGELES      )

I, N. Antoinette Cèrge, a duly commissioned and licensed court reporter, State of California, do hereby certify that I reported the taking of the Deposition of Andrew Bidou, Non-Confidential Portions, on Friday, May 23, 2025;

That prior to being examined, the deponent was, by me, duly sworn to testify to the truth. That I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript of said deposition is a complete, true, and accurate transcription of said shorthand notes.

I further certify that I am not a relative or employee of an attorney or counsel or any of the parties, nor a relative or employee of an attorney or counsel involved in said action, nor a person financially interested in the action.

IN WITNESS THEREOF, I have hereunto set my hand in my office in the County of Los Angeles, State of California, this 27th day of May 2025.

N. Antoinette Cèrge, CSR No. 7294

136

EXHIBIT F

EXHIBIT F

1                   UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF CALIFORNIA

3

4     _____
                                      )
5     DEYANA JENKINS, an individual,  )
                                      )
6                 Plaintiff,          )
                                      ) Case No.
7              -vs-                   ) 2:19-CV-01896-TLN-DB
                                      )
8     CITY OF VALLEJO, a municipal    )
      corporation; ANDREW BIDOU, in   )
9     his individual capacity as      )
      Chief of Police; COLIN EATON,   )
10    in his individual capacity as   )
      Police Officer for the CITY OF  )
11    VALLEJO; JORDON PATZER, in his  )
      individual capacity as Police   )
12    Officer for the CITY OF VALLEJO; )
      and DOES 1-50, inclusive,       )
13                                    )
                  Defendants.         )
14                                    )

15

16              THIS TRANSCRIPT CONTAINS
                 CONFIDENTIAL SECTIONS
17              PLEASE TREAT ACCORDINGLY

18

19

20        DEPOSITION OF LIEUTENANT STEVE DARDEN

21               CONDUCTED REMOTELY

22              MONDAY, APRIL 28, 2025

23

24

25

                                                              1

1    upset about that.

2         Q.   My understanding -- and this is based on IA and

3    records that have been made public -- is that Detective

4    Mat Mustard referred to Detective Jason Scott, who's

5    African-American, as "boy," b-o-y, in a sense that you

6    might hear in the 1940s in Mississippi.

7              Is that your understanding of part of the

8    incident?

9         A.   Part of it, yeah.  I recall hearing that.

10        Q.   And then he made some sort of comment, it

11   sounded, like in reference to Mr. Scott being the color

12   of his dog's ass or something to -- to that effect.

13             Are you familiar with that part?

14        A.   I don't know all the details, but, again, I'd

15   heard rumor of things that were said that were racist.

16        Q.   Did you ever talk to Detective Scott about it?

17        A.   I did, but not in detail.  He was more upset

18   that -- that he reported it and he still had to work

19   with him.

20        Q.   At that time, Mustard was the sergeant of the

21   detectives; right?

22        A.   Yes.

23        Q.   And you guys refer to that as the

24   investigations bureau, correct, detectives?

25        A.   Yes.

47

Steve Darden                                                    April 28, 2025

1        I, LAURA L. MAES, CSR No. 9836, do hereby certify:

2

3        That the foregoing deposition of LIEUTENANT STEVE

4   DARDEN was taken before me at the time and place herein set

5   forth, at which time the witness was placed under oath and

6   was sworn by me to tell the truth, the whole truth, and

7   nothing but the truth;

8

9        That the testimony of the witness and all objections

10  made by counsel at the time of the examination were recorded

11  stenographically by me and were thereafter transcribed under

12  my direction and supervision, and that the foregoing pages

13  contain a full, true and accurate record of all proceedings

14  and testimony to the best of my skill and ability.

15

16       I further certify that I am neither counsel for any

17  party to said action, nor am I related to any party to said

18  action, nor am I in any way financially interested in the

19  outcome thereof.

20

21

22

23

24

25

                                                            204

Steve Darden                                                                      April 28, 2025

```
 1          IN WITNESS WHEREOF, I have subscribed my name this 9th

 2     day of    May         , 2025.

 3

 4                        _____

 5                        LAURA L. MAES, CSR NO. 9836

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



205