```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF CALIFORNIA

 3

 4   DEYANA JENKINS, AN INDIVIDUAL,    )
                                       )
 5              PLAINTIFF,             )
                                       )
 6        VS.                          ) CASE NO. 2:19-CV-01896
                                       )           TLN-DB
 7   CITY OF VALLEJO, A MUNICIPAL      )
     CORPORATION; ANDREW BIDOU, IN HIS )
 8   INDIVIDUAL CAPACITY AS CHIEF OF   )
     POLICE; COLIN EATON, IN HIS       )
 9   INDIVIDUAL CAPACITY AS POLICE     )
     OFFICER FOR THE CITY OF VALLEJO;  )
10   JORDON PATZER, IN HIS INDIVIDUAL  )
     CAPACITY AS POLICE OFFICER FOR THE)
11   CITY OF VALLEJO AND DOES 1-50,    )
     INCLUSIVE,                        )
12                                     )
                DEFENDANTS.            )
13   _____)

14

15

16          REMOTE DEPOSITION OF SHAWNY WILLIAMS

17                 NONCONFIDENTIAL PORTIONS

18               TUESDAY, OCTOBER 28, 2025

19

20

21

22   STENOGRAPHICALLY REPORTED BY:

23   LAURY WASOFF, CSR NO. 10995

24   JOB NO.:      327059

25
```

1

1   about you being threatened and that no such thing like

2   that had happened?  Were you aware of that?

3       MR. WILSON:  Objection.  Compound.  Counsel is

4   testifying.

5       THE WITNESS:  This was after I was resigned?

6       Q    BY MS. NOLD:  Yeah.  I believe it was the very

7   next city council meeting that occurred after that.

8       MR. WILSON:  Same objections.

9       THE WITNESS:  No.

10      Q    BY MS. NOLD:  Okay.  I wasn't sure if you were

11  still watching council meetings or staying involved in

12  this stuff after you left.

13          In May or so of this year, do you recall being

14  scheduled for a deposition in this matter initially?

15      A.   Yes.

16      Q.   And that date was canceled.  Is that your

17  understanding?

18      A.   Yes.

19      Q.   Did you cancel that date?

20      MR. WILSON:  Object to the extent that involves any

21  communications you've had with attorneys for the City of

22  Vallejo as being covered by attorney-client privilege.

23      Q    BY MS. NOLD:  Okay.  And that's a gray area

24  question.  If you, for example, called because you

25  needed to cancel the deposition, that wouldn't be a

19

1    privileged conversation.  That's a scheduling thing.  If

2    you became aware of it during communications or the

3    answer would require you to discuss communications that

4    came up during the conversation with your attorney, then

5    that would be privileged.  Does that make sense?

6         A.    Yes.  I think so.  So do I answer or not?

7         Q.    Maybe we can give you a different question.  It

8    might be a cleaner question.  Did that get rescheduled

9    because you had a conflict in your ability to be there?

10        A.    No, I don't believe so.  I haven't looked at

11   that email, but I don't believe so.

12        Q.    Okay.  And that's the best of whatever your

13   recollection is without -- I obviously don't want you to

14   have to refer to documents necessarily.

15            At some point I was notified that the city was

16   no longer going to be defending you or producing you for

17   your deposition.  Is it your understanding at some point

18   you were supposed to be getting separate conflict

19   counsel for this deposition?

20        A.    Yes.

21        MR. WILSON:  Again to the extent that that answer

22   calls for any discussions or communications between

23   counsel for the city, that would be attorney-client

24   privilege.

25            And I'm sorry, Chief Williams.  I think I

```
 1    stepped over your answer.  I believe you said yes.
 2         THE WITNESS:  Yes.
 3         Q    BY MS. NOLD:  And you did obtain conflict or
 4    outside counsel, Mr. Hicks.  Is that correct?
 5         A.   That's correct, yes.
 6         Q.   Is the City of Vallejo paying for your attorney
 7    since you acquired outside counsel?
 8         A.   No.
 9         Q.   In October 2022, your employment with the City
10    of Vallejo ended abruptly.  Is that correct?
11         A.   Yes.
12         Q.   Do you feel that you were at risk of
13    retaliation, harassment, or potential physical or
14    financial injury as a result of you providing testimony
15    in this case today?
16         MR. WILSON:  Objection.  Compound.
17         Q    BY MS. NOLD:  I'm sorry.  I didn't catch your
18    answer.
19         A.   Could you repeat that question again?
20         Q.   Do you feel that you are at risk of
21    retaliation, harassment, or potential physical or
22    financial injury as a result of you providing testimony
23    in this case today?
24         MR. WILSON:  Same objection.
25         THE WITNESS:  Yes.
```

                                21

1      Q    BY MS. NOLD:  As a result of your answer, I'm

2  designating you as a whistle-blower in these

3  proceedings.  If you receive any correspondence, calls,

4  visits to your home, if you observe anyone surveilling

5  you or anything you deem to be attempt to intimidate or

6  harass you, please immediately contact your attorney and

7  have him let me know so we can notify the Court and the

8  Department of Justice regarding criminal witness

9  intimidation.  Okay?

10      A.   Yes.

11      Q.   Attempts to intimidate or deter a federal

12  witness are crimes identified by the California Penal

13  Code and under federal law, and you have protection from

14  being subjected to anyone attempting to deter you from

15  testifying truthfully.  Do you understand that?

16      A.   Yes.

17      Q.   And are you familiar with those laws regarding

18  witness intimidation?

19      A.   Yes.  Well, the state laws.  I'm not familiar

20  with the federal laws.

21      Q.   Okay.  And are you familiar with those laws

22  because of this deposition, or were you familiar with

23  those laws prior to this year?

24      MR. HICKS:  I will object on his behalf.  Obviously

25  you're not asking any questions about any conversations

22

1    that we have had.  That would be governed by

2    attorney-client privilege.

3              So if you, Chief Williams, have your own

4    understanding of certain laws, please respond in that

5    fashion as opposed to with any conversations that we

6    have had.

7        Q    BY MS. NOLD:  Yeah.  And just to clarify, any

8    conversation you had with Mr. Hicks, that's a privileged

9    conversation.  Prior to you meeting him, for example, if

10   you became familiar with those laws, that would be what

11   I'm aiming at.  Any conversation with him, then that

12   would be something that you would not answer

13   affirmatively to.  Does that make sense?

14       A.   Yes, that make sense.  I don't have a deep

15   knowledge of the intimidation whistle-blower laws.  I'm

16   aware of them, but I couldn't explain.  I don't have a

17   deep understanding.

18       Q.   Fair.  That is not tending to be something that

19   you arrest people for in relationship to normal law

20   enforcement in the capacity you served.  Correct?

21       A.   That's correct.

22       Q.   Have you been subjected to harassment, threats,

23   or intimidation or threats of retaliation in

24   relationship to this deposition?

25       MR. WILSON:  Objection.  Compound.

                              23

```
 1        THE WITNESS:  Yes.

 2        Q    BY MS. NOLD:  Who subjected you to harassment

 3   or threats in relationship to this deposition, if you

 4   can identify the person?

 5        A.   Ms. Knight, Katelyn Knight.

 6        Q.   Ms. Knight who is on the Zoom right now?

 7        A.   Yes.

 8        Q.   Can you explain to me in detail what was said

 9   or done by Ms. Knight that you deem to be harassment or

10   threats of retaliation in relationship to this

11   deposition?

12        MS. KNIGHT:  Objection.  Attorney-client privilege.

13   I'm going to have to instruct the witness not to answer

14   to the extent that that includes communications between

15   any attorneys for the City of Vallejo, myself included,

16   and Mr. Williams.

17        MS. NOLD:  There's no attorney-client privilege for

18   intimidation of a witness in relationship to a

19   deposition.  That's a crime.  So there's no -- you have

20   no protection if you've attempted to intimidate a

21   witness in this matter.  And then obviously it's

22   objectionable that you're here at all knowing that that

23   happened.  But there's no attorney-client privilege for

24   criminal action.  You agree with that.  Right?

25        MS. KNIGHT:  Ms. Nold, the communications at issue,
```

                                24

1    I believe, are related to this deposition and legal

2    advice.  Characterizing them as harassment/intimidation

3    is not something that is going to bring them outside of

4    the attorney-client privilege protection.

5        MS. NOLD:  Yes, it does.  If you are intimidating a

6    witness in relationship to this matter, you've done

7    something to harass, threaten, or intimidate a witness

8    in this matter, you don't have attorney-client

9    protection for this.  Because due to whatever conflict

10   that arose, you caused him to get and pay for his own

11   attorney.  So obviously there's something that occurred

12   during that process.  He's entitled to testify about

13   what you did to attempt to intimidate him as a witness

14   in this matter.

15       MS. KNIGHT:  That is incorrect.  To the extent that

16   there were any communications not related to this

17   matter, the deposition, the attorney-client relationship

18   between Mr. Williams's attorneys for the City of

19   Vallejo, those communications would be fine.  I don't

20   believe that there are any outside of discussions about

21   this specific deposition and matter, which are all

22   covered by privilege.

23       MS. NOLD:  There's no criminal coverage.  If you

24   intimidated or threatened, it's his belief that

25   you personally threatened retaliation, threatened him,

25

1    and attempted to intimidate him in relationship to this

2    matter, and you believe that you have attorney-client

3    protection for trying to intimidate a witness who was a

4    former employee of the city and a whistle-blower?

5    That's your argument?

6        MS. KNIGHT:  If the intimidation consists of giving

7    legal advice about a matter, however it is perceived,

8    yes, that is squarely covered by attorney-client

9    privilege.

10       MS. NOLD:  That you're contending is legal advice

11   but he perceived as you attempting to threaten or

12   intimidate him.  That would be a crime.  Right?  If you

13   threatened or intimidated a witness to try to defer them

14   from testifying, you would acknowledge that that's a

15   crime.  Right?

16       MS. KNIGHT:  Ms. Nold, I'm not going to have an

17   argument with you about what the law is or what would or

18   would not be covered.  I'm objecting based on

19   attorney-client privilege and instructing the witness

20   not to answer.

21       MS. NOLD:  I'm going to take a break.  I'm going to

22   try to get our magistrate judge on the line so we can

23   try to get this handled right now so we don't have to

24   reschedule the deposition for these specific questions.

25           We're off the record.  I'm going to reach out

26

1    to Judge Reagan.  I'll see if he is available.

2                (Recess.)

3        MS. NOLD:  Back on the record.

4            We had a conversation during the break where

5    the city is advising no questions are to be answered

6    regarding Chief Williams's affirmative answer to having

7    been harassed or threatened in relationship to this

8    deposition.  And we're waiting for the judge's chambers

9    to get back to us and hopefully resolving this today.

10       MR. WILSON:  To clarify the off-the-record

11   discussion, the instruction was anything involving

12   discussions with counsel for the city is attorney-client

13   privileged and the witness will be instructed not to

14   answer.  You're free to ask him any questions other than

15   about communications he's had with counsel for the city.

16       MS. NOLD:  I understand.  You don't want me to ask

17   questions about counsel for the city intimidating the

18   witness.  I understand that.  That's clear.

19       MR. WILSON:  Objection.  Counsel is testifying.

20       MS. NOLD:  I'm relating what Mr. Williams has

21   already stated, his experience that the city doesn't

22   want him to testify about.

23       MR. WILSON:  Same objection.

24       MS. NOLD:  Sure.

25       Q.   Okay.  Chief Williams, why did your employment

27

1    with the City of Vallejo end in October of 2022?

2        MR. WILSON:  I'm just going to object to the extent

3    that that calls for discussions with counsel for the

4    city.  It would be attorney-client privileged.  If there

5    is other answers, you're certainly free to give those.

6        THE WITNESS:  Why did it end?  So -- well, my

7    resignation was a result of a pattern of constructive

8    termination hostility.  There was racial animus,

9    retaliatory things that were happening that just made it

10   unbearable or impossible for me to perform my duties in

11   a safe environment.

12       Q    BY MS. NOLD:  And when you say "racial animus,"

13   was that being directed to you or was that racial animus

14   directed towards other employees of the City of Vallejo,

15   just for clarity?

16       A.   Specifically there was racial hostility towards

17   me, yes, and also others within the city.

18       Q.   And who was the racial hostility coming from?

19   Were there specific individuals that you can identify?

20       A.   Yes.

21       Q.   And who were those individuals?

22       A.   Well, there was Lieutenant Nichelini, Michael

23   Nichelini made statements.  There was a sergeant that

24   made comments about "This black Jesus can't save us."

25   There were other incidents that I reported related to

1    Michael Nichelini.

2        Q.    And you mentioned a hostile work environment.

3    Was the hostile work environment something that was the

4    result of the racial animus and that tone, or were there

5    other things involved that created the hostile work

6    environment?

7        A.    Yes.

8              Could you repeat that?  There was a couple

9    other incidents that I just thought about.  There were

10   some other racial hostilities or comments that were made

11   to me by Joe Iacano.  And prior to my employment there

12   was a racial comment made to me that was disturbing.

13       Q.    Okay.  I'm trying to write all that down.  And

14   as we go, if something pops up, something that comes

15   back to your recollection, you can sort of supplement

16   information, because it may not be something you've

17   thought about in the last few years.

18             Now, I think specifically I had asked if the

19   hostile work environment, was that specific to racial

20   animus or were there additional things beyond the race

21   issues that created a hostile work environment?

22       MR. WILSON:  I'm going to object to this line of

23   questioning as being not proportional to anything in the

24   case.

25             Melissa, would you be willing to do a standing

                                29

1    counsel, it would be privileged.  If you have some basis

2    other than discussions with counsel, you can answer.

3         THE WITNESS:  Well, yes.  Mike Malone was in

4    discussions with the police union, yes.

5         Q    BY MS. NOLD:  Mike Malone was in discussions

6    with the police union in relationship to officer

7    discipline?

8         MR. WILSON:  Calls for speculation.

9         THE WITNESS:  I couldn't answer that.

10        Q    BY MS. NOLD:  And I only want what you know.

11   You can make all kinds of -- guess all sorts of things.

12   I want it to be based on something you observed, heard,

13   or knew about during the course of the time you were

14   there or something you came to know afterwards.

15        A.   Yeah.  The specific incident that I'm thinking

16   about, I don't know if he had conversations with the

17   union regarding that case.

18        Q.   Do you know if he had conversations with the

19   union regarding any other cases outside the one that is

20   kind of in your mind right now?

21        A.   No.  I can't think of cases now regarding that.

22        Q.   One thing you also had mentioned when we talked

23   about the reason for your leaving the city were

24   retaliatory actions.  Can you explain to me what you

25   mean by retaliatory actions?

50

1    A.    There was one incident.   This involves the city

2  attorney.

3    Q.    Okay.   And you're saying something retaliatory

4  in relationship -- okay.   Something retaliatory from the

5  city attorney or that you discussed with the city

6  attorney?

7    MR. WILSON:   I'll object.   To the extent calls for

8  the contents of any discussions with counsel, it's

9  privileged.

10    Q    BY MS. NOLD:   So I just want to be clear.   Was

11  it something retaliatory that you reported to the city

12  attorney?

13    A.    No.

14    Q.    Okay.   In the alternative, was it -- or maybe

15  there's a third option.   Was it that you believed you

16  faced retaliation from the city attorney?

17    A.    From the city attorney, yes.

18    Q.    And the conversations that you consider

19  retaliatory, were those conversations you had with the

20  city?   Were there conversations with them or were there

21  other actions outside of those conversations that you

22  deemed retaliatory?   Does that make sense?

23    MR. WILSON:   To the extent that calls for the

24  contents of any discussion with counsel, it's

25  attorney-client privileged.   Otherwise you can answer.

51

1      THE WITNESS:  It was a conversation with them which

2   I considered a threat towards me.

3      Q    BY MS. NOLD:  When was that in time in

4   relationship to, let's say, for example, how many days,

5   weeks, months, or years before you left?

6      A.   That was about ten months or 11 months before I

7   left, I believe.

8      Q.   Was that also Ms. Knight?

9      A.   No.

10      Q.   Who was that?

11      MS. KNIGHT:  Objection.  Attorney-client privilege.

12   I'm going to instruct the witness not to answer.  The

13   entire communication is covered.

14      Q    BY MS. NOLD:  An attorney employed by the City

15   of Vallejo.

16      MS. KNIGHT:  Same objection and instruction.  It

17   does not matter if it was internal or external.  It is

18   an attorney-client communication.

19      MS. NOLD:  All of these will be coming back.  These

20   questions will all be returning.

21      Q.   Outside of retaliatory actions by the city

22   attorney's office, were there additional incidents or

23   things that you consider retaliatory from other

24   departments or the city manager, any other department or

25   person or employee?

52

1      A.   Outside of the city attorney's office, you

2   said?

3      Q.   Yeah.  Outside of them.

4      A.   Yeah.  The anonymous mail threats that I

5   received.

6      Q.   Okay.  So tell me about -- okay.  Can you tell

7   me any verbal, written, physical threat that you

8   received while working with the City of Vallejo?  Sounds

9   like you indicated the mail threats.  Did you receive

10  any threats that were outside of mail threats?

11  Face-to-face?  Phone calls?  Or were they exclusively in

12  the mail?

13      MR. WILSON:  Objection.  Compound.

14      THE WITNESS:  Face-to-face threats, I can't think of

15  any face-to-face threats right now.  The mail threats,

16  the email threats, those I can recall.  The post mail

17  threats after I left I can recall.

18      Q    BY MS. NOLD:  Did you ever receive any phone

19  call threats, anything that came over a landline, cell

20  phone that you recall?

21      A.   No.

22      Q.   And can you describe the threats that you

23  received in the mail?  I guess starting with the first

24  thing that you deemed to be threatening that you

25  received in the mail.

53

1      A.   The first threat, which I think came in October

2   of 2022, about three weeks before I left, was a

3   Halloween card threat.  It was an audible card, so when

4   you opened the card, the audio would start and wouldn't

5   stop until the battery ran out.  Also, if you tried to

6   disable it, it had some type of graffiti in it that

7   would explode.  But that was the first one, which I

8   believe, if I recall correctly, said "Quit today."  And

9   it said some other things too.  "Worst boss ever."  Some

10   other things it had in it.

11        And the secretary received it.  She opened it,

12   and it had this loud screeching sound that filled the

13   hallway.  And I believe I was in the office with my

14   captain at the time, Drew Ramsey.  And I actually

15   thought it was some type of domestic violence occurring

16   outside the building because it was so loud, until I

17   went to the office next door and she had opened it.  And

18   I recall her saying -- her initial statement was "This

19   is evil."  So that was the first mail threat.

20      Q.   And who was the secretary that opened it?  Do

21   you recall?

22      A.   Deedee.  I think it was Deedee.  I forgot her

23   last name.

24      Q.   You understood her to be a secretary?  Was she

25   your secretary?

                              54

1      A.   She was the secretary for the chief's office,

2    yes.  But she basically was helping the captain and the

3    deputy chief.

4      Q.   And so that was sent to and received at the

5    Vallejo Police Department and addressed to you?

6      A.   That's correct.  It was subsequently booked

7    into evidence.  A police report was done.

8      Q.   And were there additional mail threats that you

9    received?

10      A.   Yes.  In 2023 there were several letters sent

11    to me to my personal home, a property I own outside the

12    state.

13      Q.   Do you know how many were received total?

14      A.   At least two.  There was another that I think

15    was discarded, I believe.  To my knowledge was

16    discarded.

17      Q.   And so at least the one you received at your

18    personal home and then another additional property that

19    you own in another location?

20      A.   Yes.

21      Q.   What was the nature of those letters?  What

22    were the contents, if you recall?

23      A.   I haven't looked at it in two years, but the

24    content, context was that the officer involved in the

25    shooting received his job back, and it basically

55

Shawny Williams                                              October 28, 2025

```
 1   threatened some bad things were coming my way.  And it
 2   had some other disparaging comments or obscene comments
 3   in it regarding me.
 4       Q.   If you're able to, can you be more specific,
 5   like what those comments were?
 6       A.   Well, I haven't looked at it in a while, but
 7   some bad things were coming my way.  "Wait til PORAC
 8   gets ahold of this.  PORAC is a state law enforcement
 9   agency, kind of a union for the state.  And they produce
10   a magazine, and sometimes they do write-ups.  I
11   believe -- I haven't looked at it, like I said, and I
12   don't want to speculate.  But it had some comments about
13   some bad things were coming my way.
14       Q.   And you said there was, you think, a third
15   letter or was that -- you received one, you said, while
16   you were there, and then you said two to three once you
17   had actually -- after you had left?
18       A.   That's correct.
19       Q.   Do you remember the content of the one you said
20   was comments about an officer that had received his job
21   back?  Was that Jarrett Tonn?
22       A.   Yes.
23       Q.   And was there a separate letter that had
24   different content in it?
25       A.   It had different content, yes.
```

56

1      Q.    What was the content in the other

2    correspondence?

3      A.    I was only told by the residents at the address

4    about there were obscenities and some other comments

5    about the idea that I had hurt or destroyed the

6    department or something to that effect.  But I don't

7    have those comments in front of me.  I believe that

8    other letter was discarded.

9      Q.    So that was sent to you but received by a third

10   party, a different person?

11     A.    That's correct.

12     Q.    Like a tenant?

13     A.    Yeah, that's correct.

14     Q.    Did you ever have any experiences where there

15   were -- while you were still there or after you left

16   where you thought you were followed or surveilled by

17   anyone?

18     A.    I didn't have any evidence that I was being

19   surveilled, but there was one occurrence during COVID

20   where the captain had the staff look up my home address.

21     Q.    And did you understand -- who do you understand

22   to have looked up your address?

23     A.    I believe it was Joe Iacano.

24     Q.    And you came to understand that they had looked

25   up your home address for some reason?

1       A.    Yes.

2       Q.    How did you find out that they had looked up

3    your home address?

4       A.    He told me.

5       Q.    Did he have any reason to look up your home

6    address or to need your home address?

7       MR. WILSON:  Calls for speculation.

8       THE WITNESS:  I don't know why he looked up my home

9    address, but it was in relationship to the protest.

10      Q    BY MS. NOLD:  You said protest.  You're talking

11   about in 2020, like around George Floyd, Sean

12   Monterrosa, that time zone?

13      A.    Yes.

14      Q.    Did you take it as -- I guess as a threat or

15   concerning that he was letting you know he looked up

16   your address?

17      A.    I took it as -- well, it didn't make a lot of

18   sense to me, but I was a little suspicious of it.

19      Q.    It's fair to say that in retrospect it seems

20   more concerning than it did at the time?

21      A.    Yes.

22      Q.    Did you receive any other threatening

23   communications, written or otherwise, that you recall

24   sitting here?

25      A.    The emails.  There was emails that I received,

58

1    anonymous emails.

2        Q.   When you say anonymous, were they -- did they

3    come from an email address that you could see but fair

4    to say somebody that you didn't know the identity of the

5    person or it didn't identify a specific sender?

6        A.   Yeah.  I think it was a Proton account.  I

7    think that's what they're called.

8        Q.   Proton Mail?

9        A.   Proton.  I believe that's what it was.

10       Q.   As you sit here do you remember any of the

11   handles, the emails that they sent?

12       A.   No.  No, I don't.  I don't.

13       Q.   About how many of those anonymous sort of

14   correspondence did you get from Proton Mail email

15   addresses?

16       A.   I'd say over a half dozen.  Maybe a dozen.  I

17   can't recall the numbers now.  I do recall two specific

18   emails that had many of the, I guess, members of the

19   union, the officers union cc'd.  One was on my birthday,

20   I believe.  July 26.  And the other was a couple days

21   after that, I believe.

22       Q.   Was this over the range of time that you were

23   there, from like 2019 to 2022?  Or did the messages

24   start at a particular time or do you recall?

25       A.   I think some of the messages began around the

59

```
 1    same time the discipline -- I issued a notice of intent

 2    to discipline on the officer-involved shooting in

 3    December of 2021, and it continued up until my

 4    resignation.

 5         Q.   Were those sent to your official City of

 6    Vallejo email address?

 7         A.   Yes.

 8         Q.   Have you, since you left, received any in your

 9    private email address?

10         A.   No.

11         Q.   Would anybody have any reason to have or know

12    your private email address?

13         A.   Other than the city attorney, no.

14         Q.   What was the nature of those anonymous

15    correspondence?  What were the contents of those emails?

16         A.   They were hostile, toxic.  I mean, they related

17    to various -- my performance or various things that were

18    going on with the police department.

19         Q.   Did you ever report any of these emails or

20    letter communications to the city manager or anybody at

21    the City of Vallejo?

22         A.   Yes.

23         Q.   Who did you report the threats to?

24         A.   The city manager.  I think the human resource

25    director.  To various department leaders.
```

60

1     Q.   You weren't hiding those threats and trying to,

2   say, handle them on your own or just kind of suck it up?

3     A.   No.

4     Q.   Were you seeking assistance to try to get this

5   stopped or investigated?

6     A.   Yes.

7     Q.   Did you at any point ask for those threats to

8   be investigated?

9     A.   Yes.  Formally.

10     Q.   Formally?  Like did you put it in writing?

11     A.   Yes.

12     Q.   Were you ever interviewed by anybody that you

13   believe was investigating them?

14     A.   No.

15     Q.   Okay.  So to your knowledge -- based on having

16   never been interviewed about this, to your knowledge was

17   there ever an investigation done?

18     A.   To my knowledge, no.

19     Q.   And to conduct an investigation into threats

20   related to you, they would need to talk to you.  Right?

21     A.   Yes, I believe so.

22     Q.   Did you turn over the information or did you

23   just report it with the expectation of an investigation

24   that would retrieve the emails and correspondence?

25     A.    I believe I sent the correspondence to the city

                                61

1    manager.  I made a report regarding the racially

2    motivated comments during that meeting, and I sent that

3    to the city manager.  And I believe in October I sent

4    another email with some of the additional information to

5    the city manager requesting an investigation into the

6    online attacks that were going on as well.  I guess

7    there was some websites, VPD Burning or VPD Truth or

8    some other websites that created a hostile work

9    environment.

10        Q.   My understanding, there was Facebook pages and

11   websites that seemed to be solely focused on disparaging

12   you and questioning your leadership and things like that

13   that were being promoted on local Vallejo Facebook pages

14   and things like that.  Is that what you're talking

15   about?

16        A.   Yes.

17        MR. WILSON:  Objection.  Compound.  Counsel is

18   testifying.

19        Q    BY MS. NOLD:  So you reported that information

20   to the city, and when you reported that, was is it your

21   belief that those websites were being created or you

22   thought they were being created by somebody that worked

23   at the City of Vallejo or somebody that they had some

24   sort of control over?

25        A.   Yes, that's correct.

                              62

1       Q.    And were you ever interviewed in relationship

2    to an investigation about that?

3       A.    No.

4       Q.    Did your deputy chief, Jason Ta, know about

5    these various concerns related to threats and emails?

6       MR. WILSON:  Calls for speculation.

7       THE WITNESS:  Can I answer?

8       Q    BY MS. NOLD:  Yeah.

9       A.    Yes, I believe so.

10      Q.    Do you recall having conversations with him

11   about the correspondence that you received?

12      A.    Yes.

13      Q.    So it's not -- you're not guessing that he did.

14   You actually recall some degree of communication with

15   him where you discussed it.  Is that fair?

16      A.    That's fair.

17      Q.    And did that include that Halloween shrieking

18   correspondence or do you recall?

19      A.    I don't recall.

20      Q.    And to date have you ever been contacted by

21   anybody regarding an investigation into any of the

22   concerns you had about threats or intimidation?

23      MR. WILSON:  Other than discussions you may have had

24   with the city attorney's office, which would be covered

25   by the attorney-client privilege.

1        THE WITNESS:  No.

2        Q     BY MS. NOLD:  To your knowledge was anybody

3    ever identified as being the responsible party for

4    sending any of those correspondence?

5        A.    Not to my knowledge.

6        Q.    So, like, for example, if a person receives a

7    threatening correspondence, the department has the

8    ability to run fingerprints, you know, do things to

9    analyze to see if they can determine who sent those

10   correspondence, or are you familiar with any of those

11   sort of CSI investigatory measures taken to determine

12   who sent you the written correspondence that arrived at

13   the Vallejo Police Department?

14       MR. WILSON:  Assumes facts not in evidence.

15   Compound.

16       THE WITNESS:  Yes.

17       Q     BY MS. NOLD:  Yes, those things were conducted?

18       A.    Oh, no.  Yes, I am familiar with the process,

19   the technology to do so, yes.

20       Q.    Okay.  You're familiar with the technology, but

21   fair to say you don't have any knowledge of that being

22   utilized to investigate who sent that to you?

23       A.    That's fair, yes.

24       Q.    As far as you know, it was never sent off to,

25   like, the FBI or the DOJ crime lab for them to be able

64

```
1    to do an investigation into those correspondence.

2    Correct?

3         A.    That's correct.

4         Q.    And to your knowledge, there was never any

5    charges filed or anything.  You never had contact with

6    the district attorney's office where they asked you to

7    be a witness or anything like that in relationship to

8    those communications.  Right?

9         MR. WILSON:  Compound.

10        THE WITNESS:  That's correct.

11        MS. NOLD:  Let's take like ten so we can get this

12   email in to the judge.  I'm assuming -- sorry.  I

13   haven't looked.  Has anybody looked to see if that came

14   in?

15        MS. CRAWFORD:  I haven't gotten an email.

16        MR. WILSON:  Nor have I.

17             (Recess.)

18        MS. NOLD:  We're back on the record.

19             During the break I had a brief meet and confer

20   with Ms. Crawford in regard to the dispute regarding the

21   attorney-client privilege, and the city is not

22   consenting to the informal use of Judge Reardon for

23   these proceedings, and we agreed to have a further meet

24   and confer that we'll set after the deposition to

25   determine whether we'll do an informal dispute or
```

65

```
 1  whether we'll do a formally noticed motion on this.

 2          I do want to say for the record, the

 3  attorney-client privilege belongs to the client.  It's

 4  theirs to waive.  They have the ability to waive it, and

 5  the city didn't have any right to demand that he doesn't

 6  answer questions if he chooses to waive it.

 7          I just wanted to ask for the record, Mr. Hicks,

 8  were you objecting to Mr. Williams answering these

 9  questions?

10      MR. HICKS:  I have no objection, which is why I did

11  not object on the record.

12      MS. NOLD:  Okay.  Thank you.  I just wanted to be

13  clear.

14      MR. WILSON:  We don't need to have an argument about

15  this on the record.  But the holder of the privilege for

16  an employee in discussions with counsel for the city is

17  the city.

18      MS. NOLD:  We'll circle back to this later this week

19  sometime hopefully.

20      Q.   Okay.  Let's get back to the questions that

21  didn't surround conversations with people in the city

22  attorney's office.

23          So Chief Williams, was there any other

24  correspondence, threats, or anything else, attempts at

25  intimidation that occurred that we haven't discussed yet
```

66

Shawny Williams                                          October 28, 2025

1      Q.   Do you believe that if you would have continued

2   working for the City of Vallejo, that you would have

3   been in some sort of physical danger or your family be

4   in danger if you had continued working there?

5      MR. WILSON:  Calls for speculation.

6      THE WITNESS:  Yes.  I had safety concerns regarding

7   my safety, yes.

8      Q    BY MS. NOLD:  And did your safety concerns

9   contribute to your -- what you can call sort of forced

10  resignation?

11     A.   Yes.

12     Q.   Did you have concerns about the city failing to

13  investigate or keep you safe?

14     A.   Yes.

15     Q.   Did you express those concerns to the city

16  manager, Mike Malone?

17     A.   I did.  One of the things that I guess

18  exacerbated my concerns was his statement that this is

19  not going to stop -- or "They're not going to stop until

20  I fire you or you quit."  And he said that over half a

21  dozen times.

22     Q.   And when he said "they," who is the "they" that

23  he was speaking of?

24     A.   The Police Officers Association.

25     Q.   Did you get the impression that that's who he

                              74